# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FAIRFAX COUNTY, VIRGINIA       :
c/o County Attorney          :
12000 Government Center Parkway    :
Suite 549            :
Fairfax, VA 22035-0064       :
               :
STATE OF MISSISSIPPI       :     **Civil Action No.**
c/o Office of the Mississippi Attorney General   :
550 High Street, 11ᵗʰ Floor       :     **JURY TRIAL DEMANDED**
P.O. Box 220           :
Jackson, MI 39205         :
               :
CITY OF CHICAGO, ILLINOIS     :
c/o Corporation Counsel
Department of Law
121 North LaSalle Street, Room 600
Chicago, IL 60602

CITY OF FALL RIVER, MASSACHUSETTS
c/o Corporation Counsel        :
Law Department          :
1 Government Center, 6th Floor      :
Fall River, MA 02722        :
               :
CHARLESTON COUNTY SCHOOL DISTRICT, :
SOUTH CAROLINA         :
75 Calhoun Street          :
Charleston, SC 29401        :
               :
BERKELEY COUNTY, SOUTH CAROLINA   :
212 Oakley Plantation Road       :
Moncks Corner, SC 29461       :
               :
and              :
               :
ALABAMA STATE UNIVERSITY     :
915 S. Jackson Street         :
Montgomery, AL 36101,       :
               :
on behalf of themselves and all other similarly   :
situated entities,          :
               :
    Plaintiffs,         :

Case: 1:08-cv-00432
Assigned To : Sullivan, Emmet G.
Assign. Date : 3/12/2008
Description: Antitrust

v.                                        :
                                          :
WACHOVIA BANK N.A.                        :
301 S. College Street, Suite 4000         :
One Wachovia Center                       :
Charlotte, NC  28288-0013                 :
                                          :
AIG FINANCIAL PRODUCTS CORP.              :
50 Danbury Road                           :
Wilton, CT  06897                         :
                                          :
BEAR, STEARNS & CO., INC.                 :
383 Madison Avenue                        :
New York, NY  10179                       :
                                          :
FINANCIAL SECURITY ASSURANCE              :
HOLDINGS, LTD.                            :
31 West 52nd Street                       :
New York, NY  10019                       :
                                          :
FINANCIAL SECURITY ASSURANCE,             :
INC.                                      :
31 West 52nd Street                       :
New York, NY  10019                       :
                                          :
FINANCIAL GUARANTY INSURANCE              :
COMPANY                                   :
125 Park Avenue                           :
New York, NY  10017                       :
                                          :
TRINITY FUNDING CO. LLC                   :
335 Madison Avenue, 11th Floor            :
New York, NY  10017                       :
                                          :
GE FUNDING CAPITAL MARKET                 :
SERVICES, INC.                            :
335 Madison Avenue, 11th Floor            :
New York, NY  10017                       :
                                          :
GENWORTH FINANCIAL INC.                   :
6620 W. Broad Street                      :
Richmond, VA  23230                       :
                                          :
NATIXIS S.A.                              :
45 rue Saint-Dominique                    :
75007 Paris, France                       :

JP MORGAN CHASE & CO.                                   :
270 Park Avenue                                         :
New York, NY  10017                                     :
                                                        :
                                                        :
PIPER JAFFRAY & CO.                                     :
800 Nicollet Mall, Suite 800                            :
Minneapolis, MN  55402-7020                             :
                                                        :
                                                        :
SOCIETE GENERALE SA                                     :
29 Boulevard Haussmann                                  :
75009 Paris, France                                     :
                                                        :
                                                        :
AIG SUNAMERICA LIFE ASSURANCE CO.                       :
1 SunAmerica Center                                     :
Los Angeles, CA  90067-6022                             :
                                                        :
                                                        :
UBS AG                                                  :
Bahnhofstrasse 45                                       :
CH-8098 Zurich, Switzerland                             :
                                                        :
                                                        :
SECURITY CAPITAL ASSURANCE INC.                         :
A.S. Cooper Building, 26 Reid Street, 4th Floor         :
Hamilton, HM 11, Bermuda                                :
                                                        :
                                                        :
XL ASSET FUNDING LLC                                    :
20 N. Martingale Road, Suite 200                        :
Schaumburg, IL  60173-2415                              :
                                                        :
XL LIFE INSURANCE & ANNUITY COMPANY :
20 N. Martingale Road, Suite 200                        :
Schaumburg, IL  60173-2415                              :
                                                        :
                                                        :
LEHMAN BROTHERS INC.                                    :
745 Seventh Avenue                                      :
New York, NY  10019                                     :
                                                        :
                                                        :
MERRILL LYNCH & CO, INC.                                :
4 World Financial Center                                :
250 Vesey Street                                        :
New York, NY  10080                                     :
                                                        :
                                                        :
MORGAN STANLEY                                          :
1585 Broadway                                           :
New York, NY  10036                                     :

NATIONAL WESTMINSTER BANK PLC                    :
135 Bishopsgate                                  :
London                                           :
EC2M 3UR, England                                :
                                                 :
NATIXIS FUNDING CORP.                            :
9 West 57th Street, 36th Floor                   :
New York, NY  10019                              :
                                                 :
INVESTMENT MANAGEMENT ADVISORY                   :
GROUP, INC.                                      :
886 Vaughn Road                                  :
Pottstown, Pennsylvania  19465                   :
                                                 :
CDR FINANCIAL PRODUCTS                           :
9777 Wilshire Boulevard, Suite 800               :
Beverly Hills, CA  90212                         :
                                                 :
FELD WINTERS FINANCIAL LLC                       :
15260 Ventura Boulevard, Suite 2220              :
Sherman Oaks, CA  91403                          :
                                                 :
WINTERS & CO. ADVISORS, LLC                      :
11845 W. Olympic Boulevard, Suite 540            :
Los Angeles, CA  90064                           :
                                                 :
FIRST SOUTHWEST COMPANY                          :
325 N. St. Paul Street, Suite 800                :
Dallas, TX  75201                                :
                                                 :
GEORGE K. BAUM & CO.                             :
4801 Main Street, Suite 500                      :
Kansas City, MO  64112                           :
                                                 :
KINSELL NEWCOMB & DE DIOS INC.                   :
2776 Gateway Road                                :
Carlsbad, CA  92009                              :
                                                 :
PACKERKISS SECURITIES, INC.                      :
Fifteen North East Fourth Street, Suite A        :
Delray Beach, Florida  33444                     :
                                                 :
SHOCKLEY FINANCIAL CORP.                         :
2229 S. Joliet Way                               :
Aurora, CO  80014                                :
                                                 :

SOUND CAPITAL MANAGEMENT, INC.            :
6400 Flying Cloud Drive, Suite 210        :
Eden Prairie, MN  55344                   :
                                          :
CAIN BROTHERS & CO., LLC                  :
360 Madison Avenue, 5th Floor             :
New York, NY  10017                       :
                                          :
MORGAN KEEGAN & CO., INC.                 :
50 N. Front Street                        :
Memphis, TN  38103                        :
                                          :
and                                       :
                                          :
MGIC                                      :
250 E. Kilbourn Avenue                    :
Milwaukee, WI  53202                      :
                                          :
                Defendants.               :
_____      :

## CLASS ACTION COMPLAINT

### NATURE OF THE CASE

1.      Plaintiffs allege herein a conspiracy among Defendants, co-conspirator Bank of

America, N.A. ("Bank of America"), and unnamed co-conspirators, to fix, maintain or

stabilize the price of, and to rig bids and allocate customers and markets for, Municipal

Derivatives (as defined below) sold in the United States and its territories.

2.      Plaintiffs and Bank of America have engaged in confidential discussions about

some of the facts and circumstances detailed in this Complaint over the last eight months in

the context of a settlement process, including a number of sessions overseen by the Honorable

Daniel Weinstein (Ret.) of JAMS.  Judge Weinstein is one of the nation's preeminent

mediators of complex civil disputes.  These discussions have been conducted pursuant to,

among other things, an agreement that requires full and timely cooperation by Bank of

America, which has been received.  The information contained in this Complaint comes in part

from information obtained from Bank of America and in part from publicly-available information, including regulatory filings.

3.    This lawsuit arises out of an illegal agreement, understanding and conspiracy among providers and brokers of Municipal Derivatives to not compete and to rig bids for Municipal Derivatives sold to issuers of Municipal Bonds. This illegal agreement, understanding and conspiracy is based on *per se* illegal horizontal communications and conduct among providers of Municipal Derivatives. These providers have engaged in communications facilitating and conduct restraining competition such as rigging of bids, secret compensation of losing bidders, courtesy bids, deliberately losing bids, and agreements not to bid. Brokers have knowingly participated in this *per se* illegal conspiracy to limit competition by facilitating indirect communications among providers and have shared the wrongful profits from the illegal agreement to restrain competition.

4.    There has been an unprecedented investigation by the United States Department of Justice's ("DOJ") Antitrust Division, the Internal Revenue Service ("IRS"), and the Securities and Exchange Commission ("SEC") into industry-wide collusive practices in the two-hundred year old municipal bond industry. A grand jury investigation currently is being conducted by the Antitrust Division in the United States District Court for the Southern District of New York. Approximately thirty (30) large commercial and investment banks, insurance companies, and brokers have been subpoenaed, and the offices of three brokers have been raided by the Federal Bureau of Investigation. Numerous employees and former employees of various Defendants recently received letters notifying them that they are regarded as targets of the grand jury investigation concerning antitrust and other violations regarding contracts related to municipal bonds.

5.    This lawsuit also follows Bank of America's conditional acceptance into the Antitrust Division's amnesty program, in connection with which there was disclosure of information regarding the conspiracy described below and the promise to provide full and complete cooperation to the Antitrust Division and the Plaintiffs and the class they seek to represent. The inevitable and practical result of this illegal conduct affected the market prices of Municipal Derivatives in all transactions.

6.    Plaintiffs bring this action to seek civil redress for their injuries on behalf of themselves and all state, local and municipal government entities and their agencies, as well as private entities, that purchased by competitive bidding or auction Municipal Derivatives in the United States and its territories directly from the Provider Defendants (as defined below) or from co-conspirator Bank of America and/or through Broker Defendants (as defined below) in the period from January 1, 1992 through the present (the "Class Period"). At all relevant times, the Provider Defendants, co-conspirator Bank of America, and the Broker Defendants issued and/or sold Municipal Derivatives. During the Class Period, Defendants, co-conspirator Bank of America, and unnamed co-conspirators agreed, combined, and conspired with each other to fix prices, and to rig bids and allocate customers and markets of Municipal Derivatives sold in the United States and its territories. As a result of the unlawful conduct of Defendants, co-conspirator Bank of America, and unnamed co-conspirators, Plaintiffs and the Class (as defined in this Complaint) received, *inter alia*, lower interest rates on these contracts than they would have in a competitive market, and paid ancillary fees and other costs and expenses related thereto. Plaintiffs have consequently suffered injury to their business and property.

7

## JURISDICTION AND VENUE

7. This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Class by reason of the violations, as hereinafter alleged, of Section 1 of the Sherman Act, 15 U.S.C. § 1.

8. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

9. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391 (b), (c) and (d), and the District of Columbia long-arm statute (D.C. Code §13-423), because during the Class Period the Defendants resided, transacted business, were found, or had agents in that District, because a substantial portion of the affected interstate trade and commerce described herein is and has been carried out in that District, and because overt acts in furtherance of the alleged conspiracy were undertaken in this District.

## PLAINTIFFS

10. Plaintiff State of Mississippi purchased one or more Municipal Derivatives from at least one Provider Defendant and/or co-conspirator Bank of America and/or through at least one Broker Defendant during the Class Period.

11. Plaintiff City of Chicago, Illinois purchased one or more Municipal Derivatives from at least one Provider Defendant and/or co-conspirator Bank of America and/or through at least one Broker Defendant during the Class Period.

12.   Plaintiff Fairfax County, Virginia purchased one or more Municipal Derivatives from at least one Provider Defendant and/or co-conspirator Bank of America and/or through at least one Broker Defendant during the Class Period.

13.   Plaintiff City of Fall River, Massachusetts purchased one or more Municipal Derivatives from at least one Provider Defendant and/or co-conspirator Bank of America and/or through at least one Broker Defendant during the Class Period.

14.   Plaintiff Charleston County School District, South Carolina purchased one or more Municipal Derivatives from at least one Provider Defendant and/or co-conspirator Bank of America and/or through at least one Broker Defendant during the Class Period.

15.   Plaintiff Berkeley County, South Carolina purchased one or more Municipal Derivatives from at least one Provider Defendant and/or co-conspirator Bank of America and/or through at least one Broker Defendant during the Class Period.

16.   Plaintiff Alabama State University purchased one or more Municipal Derivatives from at least one Provider Defendant and/or co-conspirator Bank of America and/or through at least one Broker Defendant during the Class Period.

**PROVIDER DEFENDANTS**

17.   The entities listed below are collectively referenced herein as "Provider Defendants."

18.   Provider Defendant AIG Financial Products Corp. ("AIG Financial") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, AIG Financial issued and sold Municipal Derivatives to members of the Class.

19.   Provider Defendant Bear, Stearns & Co., Inc. ("Bear Stearns") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Bear Stearns issued and sold Municipal Derivatives to members of the Class.

20.   Provider Defendant Financial Security Assurance Holdings, Ltd. ("FSAHL") is a New York corporation with its principal place of business in New York, New York. During the Class Period, FSAHL issued and sold Municipal Derivatives to members of the Class.

21.   Provider Defendant Financial Security Assurance, Inc. ("FSAI") is a New York corporation with its principal place of business in New York, New York. During the Class Period, FSAI issued and sold Municipal Derivatives to members of the Class. FSAI and FSAHL are referred to collectively herein as "FSA."

22.   Provider Defendant Financial Guaranty Insurance Company ("FGIC") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, FGIC issued and sold Municipal Derivatives to members of the Class.

23.   Provider Defendant Trinity Funding Co. LLC ("GE Trinity"), a member of the GE Funding Capital Market Services Group (GE Funding CMS), is a New York limited liability corporation with its principal place of business in New York, New York. During the Class Period, Trinity issued and sold Municipal Derivatives to members of the Class.

24.   Provider Defendant GE Funding Capital Market Services, Inc. ("GE Funding"), a member of the GE Funding Capital Market Services Group (GE Funding CMS), is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, GE Funding issued and sold Municipal Derivatives to members of the Class.

25.   Provider Defendant Genworth Financial Inc. ("Genworth Financial") is a Delaware corporation with its principal place of business in Richmond, Virginia. During the

Class Period, Genworth Financial issued and sold Municipal Derivatives to members of the Class.

26.    Provider Defendant Natixis S.A. f/k/a IXIS Corporate and Investment Bank ("IXIS") is a French corporation with its principal place of business in Paris, France.  During the Class Period, IXIS issued and sold Municipal Derivatives to members of the Class.

27.    Provider Defendant JP Morgan Chase & Co. ("JP Morgan") is a Delaware corporation with its principal place of business in New York, New York.  During the Class Period, JP Morgan issued and sold Municipal Derivatives to members of the Class.

28.    Provider Defendant Piper Jaffray & Co. ("Piper Jaffray") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota.  During the Class Period, Piper Jaffray issued and sold Municipal Derivatives to members of the Class.

29.    Provider Defendant Société Générale SA ("Société Générale") is a French corporation with its principal place of business in Paris, France.  During the Class Period, Société Générale issued and sold Municipal Derivatives to members of the Class.

30.    Provider Defendant AIG SunAmerica Life Assurance Co. ("SunAmerica") is an Arizona corporation with its principal place of business in Los Angeles, California.  During the Class Period, SunAmerica issued and sold Municipal Derivatives to members of the Class.

31.    Provider Defendant UBS AG ("UBS") is a Swiss corporation with its principal place of business in Zurich, Switzerland.  During the Class Period, UBS issued and sold Municipal Derivatives to members of the Class.

32.    Provider Defendant Wachovia Bank N.A. ("Wachovia") is a national chartered banking association with its principal place of business in Charlotte, North Carolina.  During the Class Period, Wachovia issued and sold Municipal Derivatives to members of the Class.

33.    Provider Defendant Security Capital Assurance Inc. ("Security Capital Assurance") is a Bermuda corporation with its principal place of business in Hamilton, Bermuda. During the Class Period, Security Capital Assurance issued and sold Municipal Derivatives to members of the Class.

34.    Provider Defendant XL Asset Funding Company LLC ("XL Asset Funding") is a limited liability company with its principal place of business in Schaumburg, Illinois. During the Class Period, XL Asset Funding issued and sold Municipal Derivatives to members of the Class.

35.    Provider Defendant XL Life Insurance & Annuity, Inc. ("XL Life Insurance") is a subsidiary of XL Life & Annuity Holding Co. with its principal place of business in Schaumburg, Illinois. During the Class Period, XL Life Insurance issued and sold Municipal Derivatives to members of the Class. XL Asset Funding and XL Life Insurance are referred to collectively herein as "XL."

36.    Provider Defendant Lehman Brothers Inc. ("Lehman Brothers" is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Lehman Brothers issued and sold Municipal Derivatives to members of the Class. Lehman Brothers is a wholly-owned subsidiary of Lehman Brothers Holdings Inc.

37.    Provider Defendant Merrill Lynch & Co. Inc. ("Merrill Lynch") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Merrill Lynch issued and sold Municipal Derivatives to members of the Class.

38.    Provider Defendant Morgan Stanley ("Morgan Stanley") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Morgan Stanley issued and sold Municipal Derivatives to members of the Class.

39. Provider Defendant National Westminster Bank plc ("NatWest") is a public limited company with its principal place of business in London, England. During the Class Period, NatWest issued and sold Municipal Derivatives to members of the Class. NatWest is a subsidiary of Royal Bank of Scotland.

## BROKER DEFENDANTS

40. The entities listed below are collectively referred to herein as "Broker Defendants."

41. Broker Defendant Natixis Funding Corp. f/k/a IXIS Funding Corp, and before that, f/k/a CDC Funding Corp. ("CDC") is a New York corporation with its principal place of business in New York, New York. During the Class Period, CDC acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants. CDC also functioned on some deals as a Provider, and to the extent it did so, is also referenced herein as one of the Provider Defendants.

42. Broker Defendant Investment Management Advisory Group, Inc. ("IMAGE") is a Pennsylvania corporation with its principal place of business in Pottstown, Pennsylvania. During the Class Period, IMAGE acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

43. Broker Defendant CDR Financial Products ("CDR") is a California corporation with its principal place of business in Beverly Hills, California. During the Class Period, CDR acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

44. Broker Defendant Feld Winters Financial LLC ("Feld Winters") is a California limited liability company with its principal place of business in Sherman Oaks, California.

During the Class Period, Feld Winters acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

45.    Broker Defendant Winters & Co. Advisors, LLC ("Winters") is a California limited liability company with its principal place of business in Los Angeles, California. During the Class Period, Winters acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

46.    Broker Defendant First Southwest Company ("First Southwest") is a corporation with its principal place of business in Dallas, Texas.  During the Class Period, First Southwest acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

47.    Broker Defendant George K. Baum & Co. ("Baum") is a Missouri corporation with its principal place of business in Kansas City, Missouri.  During the Class Period, Baum acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

48.    Broker Defendant Kinsell Newcomb & De Dios Inc. ("Kinsell") is a California corporation with its principal place of business in Carlsbad, California.  During the Class Period, Kinsell acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

49.    Broker Defendant PackerKiss Securities, Inc. ("PackerKiss") is a Florida corporation, with its principal place of business in Delray Beach, Florida.  During the Class Period, PackerKiss acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

50.  Broker Defendant Shockley Financial Corp. ("Shockley"), a subsidiary of NelNet Inc., is a corporation with its principal place of business in Aurora, Colorado.  During the Class Period, Shockley acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

51.  Broker Defendant Sound Capital Management, Inc. ("Sound Capital") is a Minnesota corporation with its principal place of business in Eden Prairie, Minnesota.  During the Class Period, Sound Capital acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

52.  Broker Defendant Cain Brothers & Co., LLC ("Cain Brothers") is a Delaware limited liability company with its principal place of business in New York, New York.  During the Class Period, Cain Brothers acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

53.  Broker Defendant Morgan Keegan & Co., Inc. ("Morgan Keegan"), a subsidiary of Regions Financial Corp., is a Tennessee corporation with its principal place of business in Memphis, Tennessee.  During the Class Period, Morgan Keegan acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

54.  Broker Defendant MGIC ("MGIC") is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin.  During the Class Period, MGIC acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

## NAMED CO-CONSPIRATOR

55.  Co-conspirator Bank of America, N.A., not named as a Defendant herein, is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  During the Class Period, Bank of America issued and sold Municipal Derivatives to members of the Class. Bank of America transacts business, *inter alia*, in the District of Columbia.

## UNNAMED CO-CONSPIRATORS

56.    Various other persons, firms and corporations, not named herein as a Provider Defendant, Broker Defendant, or named conspirator, have participated as co-conspirators with the Provider Defendants, the Broker Defendants, and co-conspirator Bank of America, and have performed acts and made statements in furtherance of the conspiracy.

57.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or entity, the allegation means that the corporation or entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation or entity's business or affairs.

## DEFINITIONS AND BACKGROUND

### MUNICIPAL BONDS

58.    Municipal bonds are issued by states, cities, and counties, or their agencies, as well as by private entities (collectively "issuers") to raise funds for various types of large public projects, including, for example, the construction and repair of roads, buildings, mass transit, water treatment plants, and power plants.  Because of the tax-exempt status of most municipal bonds, investors usually accept lower interest payments than on other types of borrowing. This makes the issuance of bonds an attractive source of financing to many government and private entities, as the borrowing rate available in the tax free municipal bond market is frequently lower than what is available through other channels.

59.    Municipal bonds bear interest at either a fixed or variable rate of interest.  The issuer of a municipal bond receives a cash payment at the time of issuance in exchange for a promise to repay the investors who provide the cash payment (the bond holder) over time. Repayment periods typically span at least several years.

60. In order for municipal bonds to maintain their tax-exempt status, Internal Revenue Service regulations governing the bonds generally require all money raised by a bond sale to be spent on one-time capital projects within three to five years of issuance.

61. Municipal bond proceeds typically are put into three types of funds to serve their purpose within the anticipated life of the project. The largest fund is known as the project fund or construction fund and, as its name implies, is used to pay for the construction or public works project at hand. The two smaller funds are administrative in nature, and ensure that the project fund is adequately funded and that the investors recoup their investment. The debt service fund, or "sinking fund," contains the money used to make principal and interest payments on the bond. The payments out of this fund usually are due semi-annually, although the principal portion of the payment may only be due annually. The debt service reserve fund ensures that if unforeseen contingencies occur, debt obligations can still be paid.

62. Because municipal bonds typically are used to fund multi-year projects, most of a given bond's proceeds cannot or need not be spent in one lump sum. Rather, the proceeds are spent at regularly set intervals, and are invested to earn interest until they are put to use for their stated purpose.

63. The municipal bond industry is extremely large. Approximately $385 billion worth of municipal bonds were issued in 2006, according to the Securities Industry and Financial Markets Association. The total United States municipal bond market itself presently is valued at approximately $2.6 trillion.

### MUNICIPAL DERIVATIVES

64. The investment vehicles in which issuers invest their bond proceeds until they are ripe for use are known as Municipal Derivatives. "Municipal Derivatives" is an umbrella term that refers to a variety of tax-exempt vehicles that government entities use to invest the

proceeds of bond offerings while they are waiting to spend them for their given purposes. The term has been used in the industry to describe swaps and related transactions (as defined below) and, on occasion, the various types of Guaranteed Investment Contracts (as also defined below). As used in this Complaint, the term encompasses all of the transactions described in the next twelve paragraphs.

65.   Municipal Derivatives are provided by highly rated insurance companies and large commercial and investment banks, and they typically are sold to government entities. Municipal Derivatives are a particularly favored form of investment in the municipal bond industry because they are considered safe and reliable investment vehicles.

66.   When government entities desire to purchase Municipal Derivatives (*i.e.*, enter into Municipal Derivative contracts), they frequently will engage a broker to obtain the best possible price for such derivatives by arranging an auction among multiple providers of Municipal Derivatives.

67.   Municipal Derivatives are grouped generally into two categories, pertaining either to: (a) the investment of bond proceeds, or (b) the bond's underlying interest rate obligations. The former category of Municipal Derivatives includes instruments such as Guaranteed Investment Contracts, commonly known as GICs (forward purchase, supply, or delivery agreements and repurchase agreements) and escrow agreements. The latter category of Municipal Derivatives includes instruments such as Swaps, Options, "Swaptions," Collars, and Floors, which are risk-shifting vehicles.

68.   A GIC is an agreement secured by a contract with a financial institution (*i.e.*, a provider), which guarantees a fixed rate of return and a fixed date of maturity. GICs also can mean any unallocated group contract, investment contract, funding agreement, guaranteed

interest contract or other similar instrument in which a provider agrees to guarantee a fixed or variable rate of interest or a future payment that is based on an index or similar criteria that is payable at a predetermined date on monies that are deposited with the company.[1] The types of investment agreements that the IRS generally references as GICs are: (a) Forward Purchase or Forward Delivery Agreements; (b) Repurchase Agreements or Collateralized GICs; and (c) Unsecured or Uncollateralized GICs.

69.  A Forward Purchase or Forward Delivery Agreement is often used in connection with debt service funds.  Issuers (*i.e.* municipalities and other entities authorized to issue bonds) can request bids based on rate of return or on upfront payments, although the latter is the norm.  This is an agreement wherein the buyer and seller agree to settle their respective obligations at some specified future date based upon the current market price at the time the contract is executed.  Forward contracts are generally entered into in the over-the-counter markets.  A forward may be used for any number of purposes.  For example, a forward may provide for the delivery of specific types of securities on specified future dates at fixed yields for the purpose of optimizing the investment of a debt service reserve fund.  A forward also may provide for an issuer to issue and an underwriter to purchase an issue of bonds on a specified date in the future for the purpose of effecting a refunding of an outstanding issue that cannot be advance refunded.

70.  An Unsecured or Uncollateralized GIC does not involve associated securities, but rather pure funds, and thus functions like a savings account.  It is used most often for

---

[1]    Interest rates for Municipal Derivatives typically are calculated pursuant to LIBOR or what were BMA rates.  LIBOR refers to the London Interbank Offered Rate, the standard rate for quoting interbank lendings of Eurodollar deposits, while BMA refers to the Bond Market Association Index.  The BMA Index has more recently been superseded by the SIFMA (Security Industry & Financial Markets Association) Index.

construction or project funds. In the bidding process, the issuer sets forth a proposed draw-down schedule in situations where it wants to spend all of the bond proceeds, for example, within a three-year period. These agreements typically have terms addressing flexibility issues regarding, for example, requirements to pay or not pay penalties for not meeting deadlines, such as construction benchmarks.

71. A Repurchase Agreement or "Collateralized GIC" is an agreement consisting of two simultaneous transactions whereby the issuer purchases securities from a provider, and the provider agrees to repurchase the securities on a certain future date at a price that produces an agreed-upon rate of return. This is known as a collateralized GIC because the issuer possesses securities as collateral for the GIC until the maturity date.

72. An Advance Refunding Escrow is an arrangement pursuant to which the proceeds of the refunding issue (a bond issued to refund an outstanding bond) are deposited into an escrow account for investment in an amount sufficient to pay the principal of and interest on the issue being refunded on the original interest payment and maturity dates.

73. A Swap is a type of agreement frequently used with respect to interest rate obligations. It is the sale of an instrument and the simultaneous purchase of another instrument for purposes of enhancing the investor's holdings. A swap may be used to achieve desired tax results, or to alter various features of a bond portfolio, including call protection, diversification or consolidation, and marketability of holdings. There are several types of swaps: (a) floating-for-fixed interest swap; (b) fixed-for-floating interest swap; and (c) floating-for-floating (basis-rate) swap, where the two are based on different indices (*i.e.*, LIBOR or BMA).

74.    An Option is one of two types: a Put Option or a Call Option. A Put Option is a provision in a bond contract where the investor has the right, on specified dates after required notification, to surrender the securities to the issuer or the issuer's agent at the predetermined price (usually par value). A Call Option is a transaction where the issuer repays to the holder of an outstanding security the principal amount thereof (plus, in certain cases, an additional amount representing a redemption premium) as a result of the issuer exercising a right under the bond contract to repay the security prior to its scheduled maturity date (often referred to as the "call").

75.    A "Swaption" is the combination of a Swap and an Option.

76.    A Floor (also known as an "interest rate floor") is an agreement whereby the issuer agrees to pay a stated rate of interest even if the actual rate on the variable rate debt is lower. The interest rate floor agreement is entered into with a third-party who typically pays the issuer an upfront fee in exchange for the right to collect the difference between the interest rate floor and the actual lower rate on the debt. It is used typically on variable rate debt, and refers to the minimum interest rate that can be paid on the debt. Thus, a Floor agreement establishes, for an issuer of variable rate bonds, a minimum or "floor" rate of interest that the issuer will effectively pay, though the bonds themselves may state a different minimum rate.

77.    A Collar is an agreement entered into by the issuer or obligor of variable rate debt combining an interest rate cap and an interest rate floor. As with a Floor agreement, the floor component of the Collar establishes the effective minimum rate of interest that the issuer will pay. The cap component "caps" or establishes a maximum rate of interest the issuer will effectively pay, which again may vary from the maximum stated rate of interest on the variable rate debt.

78.   Like the municipal bond industry, the Municipal Derivatives industry is very large.  A substantial portion of the approximately $400 billion annually spent on municipal bonds is invested annually in Municipal Derivatives.

79.   The Municipal Derivatives industry is relatively concentrated.  There are no more than 20 major providers of Municipal Derivatives in the United States.  With respect to GICs in particular, there are 10 to 12 major dealers in the United States.  On the other hand, the number of issuers is in the tens of thousands.

80.   In a competitive marketplace, providers would be expected to compete against each other for issuers' business on the basis of the highest rate of return for Municipal Derivatives that they could earn for issuers.

### IRS RULES AND REGULATIONS

81.   IRS rules and their corresponding regulations subject issuers to potential taxation from arbitrage (*i.e.*, profit) off of their tax-exempt bond proceeds, subject to certain exceptions.  *See* Internal Revenue Code § 148(a); Internal Revenue Code §§ 148(c), (d) and (e) (enumerating exceptions to this principle).  Specifically, if the yield from the municipal derivative exceeds the bond's yield by a certain amount, it will be deemed arbitrage and be subject to taxation.  In addition, providers cannot divert arbitrage earnings, meaning that they cannot "burn" an otherwise arbitrage yield by charging the issuer a higher fee and reducing the yield by the amount of the fee in order to comply with the rules.

82.   The purpose of the rules and regulations governing arbitrage is to limit issuers' ability to take advantage of tax exempt rates on municipal bonds by investing the bond proceeds at higher, non-tax exempt rates.  The rules and regulations, therefore, require all interest that exceeds the bond rate made on tax exempt bond investments to be rebated to the IRS, absent an exception.

83.    Another group of IRS regulations sets forth the procedure for establishing the fair market value of GICs.  *See* Treasury Reg. § 1.148-5(d)(6).  These regulations govern the bidding process for GICs, and there is a rebuttable presumption that a fair price is obtained for GICs procured in compliance with these regulations.  Key regulations include the following:

a.    The bid specifications must be in writing;

b.    The bid specifications must be timely forwarded to potential providers;

c.    The bid specifications must contain all material terms (*i.e.*, the term directly or indirectly affects yield);

d.    The bid specifications must state that by submitting a bid, the potential provider is representing that it has not consulted with other potential providers, that its bid was not submitted solely as a courtesy bid, and that the bid was determined without regard to an agreement with another issuer or other person;

e.    The bid specifications must be commercially reasonable;

f.    There must be a legitimate business purpose for all terms in the bid specifications other than solely to increase the price or reduce the yield;

g.    The bid specifications must contain a reasonably expected draw down schedule;

h.    All potential providers must have an equal opportunity to bid, and no

potential provider can have a last look to review other bids before bidding;

and

i.    The issuer must receive at least three bids from solicited providers.

84.    The intent and purpose behind the IRS safe harbor regulations is to provide a fair,

competitive, and transparent process for issuers to obtain the best possible price for tax-

exempt municipal derivatives.  But due to the concerted effort of the Broker Defendants, the

Provider Defendants and co-conspirator Bank of America during the Class Period to conspire

to fix prices, rig bids and allocate customers and markets – as opposed to competing– this

laudable goal was not realized.

## FACTUAL ALLEGATIONS

### WRONGDOING ALLEGED

85.    During the Class Period defined herein, the Provider Defendants and co-

conspirator Bank of America entered into a continuing agreement, understanding, and

conspiracy to unreasonably restrain trade and commerce in the United States, in violation of

Section 1 of the Sherman Act, 15 U.S.C. §1.

86.    In particular, the Provider Defendants, and co-conspirator Bank of America, have

combined and conspired to allocate customers and fix or stabilize the prices of Municipal

Derivatives, including the interest rates paid to issuers on such derivatives, sold in the United

States through agreements not to compete and acts of bid rigging. Overt acts in furtherance of

this conspiracy, including use of the mails or wires to transmit and process rigged bids, were

undertaken in this District.

87.    The Provider Defendants and co-conspirator Bank of America, who knowingly and intentionally engaged in these rigged auctions, understood that they would take turns providing the winning bid.  At times, the Provider Defendants directly discussed with each other the terms of their bids.  For some of these communications, audiotapes, including audiotapes of conversations involving the Provider Defendants and/or co-conspirator Bank of America's marketers of Municipal Derivatives (such as individuals on Provider Defendants and/or co-conspirator Bank of America's marketing desks) exist.

88.    On other occasions, communications between the Providers Defendants and co-conspirator Bank of America were made indirectly through one or more of the Broker Defendants, who would guide the Provider Defendants and/or co-conspirator Bank of America by suggesting the terms of their respective bids.  The Provider designated to win a particular auction frequently bid after it had been provided with the terms of the bids provided by the other bidders, a practice known as a "last look" that is expressly forbidden by IRS regulations.

89.    At times, one or more of the Provider Defendants and co-conspirator Bank of America, engaged in complementary trades to compensate other Providers Defendants and/or co-conspirator Bank of America, who either did not submit bids or who engaged in sham bids.  On other occasions, the winning Provider, including at times one or more of the Provider Defendants and/or co-conspirator Bank of America, would secretly compensate one or more Provider Defendants and/or co-conspirator Bank of America for declining to submit a bid.

90.    The Broker Defendants have knowingly participated in the illegal agreement, understanding, and conspiracy not to compete and to rig bids in order to win the favor of the Provider Defendants and co-conspirator Bank of America and share in the profits of the

conspiracy, all in breach of their fiduciary and other duties as agents for Plaintiffs and members of the class during the bidding process.

91.    The Broker Defendants touted to issuers their abilities to facilitate deals for the Provider Defendants and co-conspirator Bank of America and touted the network of relationships they created among Providers. For example, on its website, CDR claims "CDR Financial develops products and strategic alliances across a wide spectrum of financial institutions, including asset managers, banks, broker dealers and insurance companies."

92.    The interconnected nature of the Municipal Derivatives industry facilitated and reinforced the conspiratorial conduct alleged herein, leading to the massive, multi-agency government investigation. As *The Bond Buyer* reported on November 21, 2006:

> "The industry tends to be quite intertwined and interconnected," said Willis Ritter, a partner at Ungaretti & Harris here. "Virtually all the major houses are involved in selling [GICs], so if you think you've found something about one, you suspect you're going to find it about all of them."

93.    The existence of the illegal agreement, understanding and conspiracy is confirmed by *per se* illegal horizontal communications among marketing personnel employed in the municipal bond/derivative departments of the Provider Defendants and co-conspirator Bank of America. These individuals have participated in direct communications with competitor providers with respect to the following, *inter alia*:

a.    the rigging of bids, including the collusive suppression of interest rates paid to issuers on Municipal Derivatives;

b.    conduct that would be used to limit competition;

c.    sharing of profits from a winning bid with a losing bidder and other secret compensation of losing bidders;

d.      bids that would be won by specific Provider Defendants and/or co-
        conspirator Bank of America; and

e.      an exchange of a deliberately losing bid for a future winning bid.

94.     The Broker Defendants' knowing participation in the illegal agreement, understanding and conspiracy not to compete and to rig bids is established by their serving as a conduit for indirect communications among the Provider Defendants and co-conspirator Bank of America that were per se illegal. Again, overt acts in furtherance of this conspiracy, including, on information, use of the mails or wires to transmit and process rigged bids, were undertaken in this District. The Provider Defendants and co-conspirator Bank of America also shared their wrongful profits from the illegal agreement, understanding and conspiracy, by paying kickbacks to Broker Defendants. For example, Defendant CDR had a secret agreement with the provider of a GIC for bonds issued in 1999 by an authority in Gulf Breeze, Florida. The deal allowed Defendant CDR to increase its fees if none of $220 million in bond proceeds was used for its intended purpose – affordable housing.

95.     The existence of the illegal agreement, understanding and conspiracy is further established by per se illegal horizontal and coordinated conduct among the marketing personnel employed in the municipal bond/derivative departments of the Provider Defendants and co-conspirator Bank of America. These individuals have participated in, inter alia, the following conduct to limit competition, rig bids and to create the appearance of competition where there was none:

a.      courtesy bids submitted to create the appearance of competition where
        there was none;

b.    bids known to be unrealistically low and deliberately losing bids;

c.    bidding processes where only one bid was sufficiently high to make the deal work;

d.    agreements to share profits from a winning bid with a losing bidder through transactions between Provider Defendants and co-conspirator Bank of America;

e.    conduct in violation of IRS regulations relating to the bidding process;

f.    secret last look agreements; and

g.    agreements not to bid.

96.    The Broker Defendants' knowing participation in the illegal agreement, understanding and conspiracy not to compete and to rig bids is also established by their participation in the *per se* illegal conduct to limit competition, rig bids and to create the appearance of competition where there was none. Broker Defendants further participated in and facilitated the illegal agreement, understanding and conspiracy by arranging the allocation of winning bids among the Provider Defendants and co-conspirator Bank of America. The Broker Defendants further communicated to the Provider Defendants and co-conspirator Bank of America concerning, *inter alia*:

a.    winning bids that would be allocated to Provider Defendants and co-conspirator Bank of America;

b.      confirming understandings that bids would be won by Provider

Defendants and co-conspirator Bank of America;

c.      confirming understandings that bids would be lost by Provider Defendants

and co-conspirator Bank of America;

d.      the fact that bids were being rigged; and

e.      bid levels that would be necessary by Provider Defendants and co-

conspirator Bank of America to win or lose a bid.

97.    Individuals employed by the Provider Defendants and co-conspirator Bank of

America who have engaged in the illegal communications and conduct among Provider

Defendants and co-conspirator Bank of America to restrain competition include, *inter alia*:

a.      Douglas Campbell, a former co-conspirator Bank of America sales team

manager who also formerly worked at Defendant Piper Jaffray;

b.      Dean Pinard, former manager of co-conspirator Bank of America's

derivatives department;

c.      Phil Murphy, former head managing director of co-conspirator Bank of

America's derivatives department;

d.      James Hertz, former vice-president in Defendant JP Morgan's tax-exempt

capital markets group;

e.      Stephen Salvadore, Managing Director of municipal capital markets and

derivatives at Defendant Bear Stearns;

    f.     Jay Saunders, who worked in the derivatives marketing department at Defendant Wachovia;

    g.    Martin McConnell, who worked in the derivatives marketing department at Defendant Wachovia;

    h.    Peter Ghavami, former Managing Director and co-manager in Defendant UBS's municipal derivatives group;

    i.     Patrick Marsh, Managing Director of Deutsche Bank's municipal restructuring unit, who had worked at Defendant Bear Stearns;

    j.     Shlomi Raz, a banker who formerly worked at Defendant JP Morgan; and

    k.    Samuel Gruer, former vice-president in Defendant JP Morgan's tax-exempt capital markets group.

98.    Individuals employed by the Broker Defendants who have engaged in the illegal agreement, understanding and conspiracy include:

    a.    James Towne, former Managing Director of Defendant Piper Jaffray's municipal derivatives group;

    b.    David Lail, who worked in Defendant Baum's derivatives department; and

    c.    Mary Packer, president of Defendant PackerKiss.

99.    The conspiracy has been facilitated through intercompetitor contacts at trade associations. One such association is the International Swaps & Derivatives Association ("ISDA"). The ISDA's members include the following:  Bank of America, JP Morgan, Bear

Stearns, Société Générale, UBS, and Wachovia. Another is the American Bankers Association, which counts among its members the Bank of America, Morgan Keegan, JP Morgan, UBS, and Wachovia.

100. Co-conspirator Bank of America, which is, as discussed below, a participant in the DOJ's amnesty program, has described the conspiracy and provided information to the DOJ relating to specific rigged bids and communications among Provider Defendants to restrain competition.

101. One of the numerous instances of bid-rigging and kickbacks is the $453 million GIC that co-conspirator Bank of America provided to the City of Atlanta in 2002, in which Defendant CDR acted as the broker and handled the bidding. In a June 28, 2002 e-mail, Douglas Campbell told Phil Murphy that $182,393 was paid to Defendants CDR, Piper Jaffray, PaineWebber, and Winters. The payments were described as a bid to build co-conspirator Bank of America's relationship with these companies.

102. Other examples of bid-rigging and kickbacks exist. The IRS is examining over 20 lease-to-own deals between Defendants CDR and Société Générale, as well as Defendant CDR's involvement in California school advance refunding escrows and put option cases from several issuers around the nation. There is evidence of quarterly payments Defendant Société Générale made to Defendant CDR for "unspecified services" relating to these lease-to-own deals. The IRS's audits of 21 deals done between 1996 and 2005 now center on bid-rigging and price-fixing issues.

103. The IRS has scrutinized a $27 million bond sold by Pima County, Arizona's Industry Development Authority to help individuals buy homes. According to documents obtained from the authority, the IRS said it was concerned about quarterly payments made by

Defendant Société Générale to Defendant CDR, which structured the transaction and evaluated bids for the investment agreement. Records show that Defendant FSA was one of the four that bid for that contract.

104. As another example, in November of 2006, as part of a settlement with the IRS, it was disclosed that Defendant Baum illegally diverted profits on municipal bond deals. That settlement covered more than $2 billion worth of blind pool deals entered into between 1997 and 2001. The agency found evidence of big rigging in these deals. Defendant Baum had rigged the deals to allow Defendant CDC, who was the winning Provider on many of them, to underpay for the GIC and simultaneously overpay for other investment agreement and remarketing fees, diverting arbitrage profits back to Defendant Baum. In one case, Defendant CDC paid a large fee directly to David Lail of Defendant Baum.

105. Co-Conspirator Bank of America also provided the GIC, on at least one of the Defendant Baum transactions targeted by the IRS, a $100 million issue from the Illinois Development Finance Authority sold in 2000 by Rural Enterprises of Oklahoma, Inc. Rural Enterprises disclosed in July 2003 that the provider of the GIC made a significant hidden payment to Defendant Baum.

106. The objective of the illegal agreement, understanding, and conspiracy is to artificially suppress interest rates paid on, lower the value of, and reduce and stabilize the market prices of Municipal Derivatives sold by the Provider Defendants and co-conspirator Bank of America.

107. In addition to information supplied by co-conspirator Bank of America, the foregoing allegations are supported by disclosures in connection with investigations being

conducted by the DOJ's Antitrust Division and the IRS into industry-wide collusive practices in the Municipal Derivatives industry.[2]

## INTERNAL REVENUE SERVICE INVESTIGATION

108.    The IRS was the first agency to launch an investigation of collusive practices in the Municipal Derivatives industry. Its inquiry initially focused on dozens of municipal bond deals where the providers failed to pay $100 million in taxes by engaging in abusive arbitrage devices. The IRS was concerned that some GIC providers were overcharging issuers for GICs and other investment products. This would artificially lower, or "burn," investment yields below the bond yield. The spread between the investment and bond yields was then passed to the provider, rather than rebated to the IRS as required by the federal tax laws.

109.    In 2005, Charles Anderson, field operations manager for the IRS's tax-exempt bond office, publicly stated that "[i]t looks like bid rigging is wider and more pervasive than we thought." Mark Scott, director of the IRS's tax-exempt bond office, publicly stated that "[w]hen a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided." These types of bids are "provided solely as a courtesy so that another banking organization can win on a bid that is below fair market value," according to Scott. "We have seen transactions where the winning bid is the only bid high enough to make the deal work." As Scott went on to note, "[t]hat's basically what we've been doing . . . is following those, what I like to refer to as 'tentacles of abuse.'"

---

[2]    The SEC is also conducting a parallel investigation that has led to Wells notices recently being issued to co-conspirator Bank of America and Provider Defendants USB and FSA. Provider Defendant JP Morgan expects to receive such a notice as well. A Wells notice informs a company that an investigation by regulators is completed and charges may be filed.

110.    As the agency's investigation progressed in 2006, Anderson stated that the regulators "think we have evidence of bid rigging." The IRS probe showed that investment contracts were sold at below market rates, according to Anderson. That means lower returns for municipalities and less tax revenue for the IRS. He added, "[p]eople were winning GICs at below fair market values and there were obviously deliberate losing bids by the losing bidders, thereby allowing the winner to win a sweetheart deal."

111.    At the same time, Patrick Born, chief financial officer of Minneapolis and the head of the debt committee of the Chicago-based Government Finance Officers Association, noted: "[t]he way that these folks have operated, largely by telephone and largely out of public view, are not as transparent as they might be…. And it's certainly possible that when you don't have transparency you can have abuses."

112.    The IRS investigation led an investment banking firm to uncover transcripts of telephone conversations involving an employee that indicated the employee and other market participants were involved in bid-rigging on GICs in the municipal market.

113.    On February 7, 2007, co-conspirator Bank of America announced that it would pay $14.7 million to the IRS for its role in providing GICs in blind pool deals to some state and local government entities.

114.    In addition to the IRS regulations concerning arbitrage, as well as the federal antitrust laws, the IRS regulations governing GIC bidding also have been broken. Besides discovering illegal arbitrage, the IRS has stated that it has come across instances of price-fixing, bid-rigging and kickbacks.

### ANTITRUST DIVISION INVESTIGATION

115.    In light of these revelations, the Antitrust Division of the DOJ commenced its own investigation of the bid-rigging in the Municipal Derivatives markets. For the better part

of two years, the Antitrust Division has been examining whether there was collusion among financial institutions in the bidding process for GICs and other Municipal Derivatives. The DOJ is conducting an "investigation of anticompetitive practices in the municipal bond industry," said spokeswoman Kathleen Bloomquist.

116.    On November 15, 2006, the Federal Bureau of Investigation ("FBI") raided the offices of and seized documents from three Broker Defendants: CDR, IMAGE, and Sound Capital.

117.    Following the FBI raids, the Broker Defendants and Provider Defendants were served with subpoenas. The subpoenas sought detailed information from the companies dating back to 1992. The subpoenas asked for documents, e-mails, tapes or notes of phone conversations, and other information regarding "contracts involving the investment or reinvestment of the proceeds of tax-exempt bond issues and qualified zone academy bonds [as well as] related transactions involving the management or transferal of the interest rate risk associated with those bonds, including but not limited to guaranteed investment contracts; forward supply, purchase or delivery agreements; repurchase agreements; swaps; options; and swaptions." The subpoenas also requested corporate organizational charts, telephone directories, and lists of all individuals involved with GICs and derivatives, in addition to all documents associated with "relevant municipal contracts awarded or intended to be awarded pursuant to competitive bidding" – including invitations to bid; solicitations; notices, or requests for quotations or proposals issued to any provider; actual or proposed responses; and amounts and prices bid.

118.    On December 11, 2006, prosecutors based out of the Antitrust Division's New York field office that were tasked with investigating the alleged bid-rigging brought their case to a federal grand jury sitting in the Southern District of New York.

119.    According to news reports and company filings, the following Defendants have received governmental subpoenas: GE Funding; GE Trinity; CDR; FSA; FGIC.; Security Capital; XL Capital; IMAGE; Sound Capital; FSA; First Southwest; IXIS (and through it, CDC); Kinsell; XL Capital Assurance, Inc.; Société Générale; Baum; Feld Winters; JP Morgan; American International Group Inc.; Bear Stearns; UBS; Piper Jaffray; Wachovia.; Cain Brothers; Morgan Keegan; Shockley; Genworth Financial; and SunAmerica.

120.    At least ten current or former brokers at major Wall Street and other firms have been targeted for possible indictment by the DOJ or notified that they are part of the DOJ's investigation: James Hertz, Samuel Gruer, Shlomi Raz, Patrick Marsh, Stephen Salvadore, Peter Ghavami, Mary H. Packer, James H. Towne, Jay Saunders and Martin McConnell. Many of these individuals submitted information to the Financial Industry Regulatory Authority ("FINRA") disclosing that they were DOJ targets.

121.    As a March 3, 2008 *Bond Buyer* article noted:

> Market participants said Friday that the individuals and firms known to have been subpoenaed or to have received target letters in the investigation may just be the tip of the iceberg. Most firms are not publicly disclosing the Justice Department actions until their 10-K financial filings are due. Securities firms appear to be including disclosures of the target letters in the regulatory filings for their employees, even before their 10-K filings are due, but banks and investment advisory firms are not subject to the same disclosure requirements.
>
> . . .
>
> "Usually by the time an individual gets a target letter, the investigation is pretty far down the road and it's an indication that indictments are going to be issued in the relative near terms," said

John K. Markey, a partner at Mintz Levin Cohn Ferris Glovsky & Popeo PC in Boston, and former federal and state prosecutor.

Markey said that in a target letter, "The Department of Justice is informing an individual or his attorney that it already has substantial evidence of the commission of a federal crime. It usually is a sign that the individual is going to be indicted and it may prompt an attempt at a plea bargain or cooperation deal with the government."

## THE DOJ GRANTS CONDITIONAL AMNESTY TO BANK OF AMERICA

122.    On February 9, 2007, co-conspirator Bank of America, the second largest bank in the United States, announced that it was cooperating with the DOJ's investigation into bidding practices in the municipal bond business in exchange for leniency as part of the DOJ's amnesty program.

123.    On February 9, 2007, co-conspirator Bank of America issued a press release and stated the following:

Bank of America Corporation has entered a leniency agreement with the United States Department of Justice in Connection with the Department's investigation into bidding practices in the municipal derivatives industry. This amnesty grant was as a result of the company voluntarily providing information to the Department before the Department began its investigation, as well as the company's continuing cooperation.

The amnesty agreement provides that, in return for the company's continuing cooperation with the Justice Department's investigation, the Justice Department will not bring any criminal antitrust prosecution against the company in connection with matters that the company reported to the Justice Department.

. . .

In addition, in a matter involving the Internal Revenue Service (IRS), Bank of America has agreed to a $14.7 million settlement with the IRS relating to the company's role in providing guaranteed investment contracts and other agreements in connection with certain "blind pool" bond transactions.

124.    It was reported that key derivatives officials at the bank were on "administrative leave," including Dean Pinard.

125.    On February 28, 2008, co-conspirator Bank of America, in its SEC Form 10-K at page 123, stated the following:

> Municipal Derivatives Matters
>
> The Antitrust Division of the U.S. Department of Justice (DOJ), the SEC, and the IRS are investigating possible anticompetitive bidding practices in the municipal derivatives industry involving various parties, including BANA [co-conspirator Bank of America], from the early 1990s to date. The activities at issue in these industry-wide government investigations concern the bidding process for municipal derivatives that are offered to states, municipalities and other issuers of tax-exempt bonds. The Corporation has cooperated, and continues to cooperate, with the DOJ, the SEC and the IRS. On February 4, 2008, BANA received a Wells notice advising that the SEC staff is considering recommending that the SEC bring a civil injunctive action and/or an administrative proceeding "in connection with the bidding of various financial instruments associated with municipal securities." BANA intends to respond to the notice. An SEC action or proceeding could seek a permanent injunction, disgorgement plus prejudgment interest, civil penalties and other remedial relief.
>
> On January 11, 2007, the Corporation entered into a Corporate Conditional Leniency Letter (the Letter) with DOJ. Under the Letter and subject to the Corporation's continuing cooperation, DOJ will not bring any criminal antitrust prosecution against the Corporation in connection with the matters that the Corporation reported to DOJ. Civil actions may be filed. Subject to satisfying DOJ and the court presiding over any civil litigation of the Corporation's cooperation, the Corporation is eligible for (i) a limit on liability to single, rather than treble, damages in certain types of related civil antitrust actions, and (ii) relief from joint and several antitrust liability with other civil defendants.

### HISTORY OF FRAUD IN THE MUNICIPAL DERIVATIVES MARKET

126.    The wrongful conduct alleged herein is not the first time that Wall Street firms have run afoul of laws designed to prevent unfair profiteering on the proceeds of a bond issuance. In 1998, twenty-one firms were sanctioned for involvement in fraudulent activities

that raised the price on Treasury bonds sold to local governments, driving down the yield, to avoid restrictions on how much they could earn. This so-called "yield-burning" scandal led to settlements of $172 million as a result of misconduct on 3600 separate municipal bond issues. Piper Jaffray, one of the Provider Defendants here, was involved in the earlier municipal bonds scandal.

127.    Likewise, in 2002, Stifel Nicolaus broker Robert Cochran paid $220,000 to settle civil allegations against him in connection with bid rigging on a GIC transaction with the Oklahoma Turnpike Authority ("OTA") in 1989 and a forward contract with OTA in 1992. In the former instance, the bid was rigged in favor of Provider Defendant AIG, using a "last look." The "last look" was used to deter cheating by Provider Defendants and/or co-conspirator Bank of America by allowing the pre-designated winner to confirm that the other bidders had submitted non-competitive, sham bids before the auction closed.

## CLASS ACTION ALLEGATIONS

128.    Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All state, local and municipal government entities, independent government agencies and private entities that purchased by competitive bidding or auction Municipal Derivatives directly from a Provider Defendant or Bank of America, or through a Broker Defendant, at any time from January 1, 1992 through the present in the United States and its territories or for delivery in the United States and its territories.

129.    Plaintiffs do not know the exact number of class members because such information is in the exclusive control of the Provider Defendants, co-conspirator Bank of America, the Broker Defendants, and unnamed co-conspirators. But due to the nature of the trade and commerce involved, Plaintiffs believe that there are thousands of Class members as

above described, the exact number and their identities being known by the Provider

Defendants, co-conspirator Bank of America, the Broker Defendants, and unnamed co-

conspirators.

     130.   The Class is so numerous and geographically dispersed that joinder of all

members is impracticable.

     131.   There are questions of law and fact common to the Class, including:

     a.     Whether Defendants and their co-conspirators engaged in a combination
and conspiracy among themselves to fix, maintain or stabilize prices, and
rig bids and allocate customers and markets of Municipal Derivatives;

     b.     The identity of the participants of the alleged conspiracy;

     c.     The duration of the alleged conspiracy and the acts carried out by
Defendants and their co-conspirators in furtherance of the conspiracy;

     d.     Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15
U.S.C. § 1;

     e.     Whether the conduct of Defendants and their co-conspirators, as alleged in
this Complaint, caused injury to the business or property of the Plaintiffs
and the other members of the Class;

     f.     The effect of the alleged conspiracy on the prices of Municipal
Derivatives sold in the United States during the Class Period;

g.    Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the other members of the Class; and

h.    The appropriate class-wide measure of damages.

132.    Plaintiffs are members of the Class, Plaintiffs' claims are typical of the claims of the Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are purchasers of Municipal Derivatives, and their interests are coincident with, and not antagonistic to, those of the other members of the Class.

133.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

134.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

135.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

136.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This

class action presents no difficulties in management that would preclude maintenance as a class action.

## TRADE AND INTERSTATE COMMERCE

137.    The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

138.    During the Class Period, Defendants and their co-conspirators issued and/or sold Municipal Derivatives in a continuous and uninterrupted flow of interstate commerce to class members located in states all across the nation, other than the states in which Defendants and their co-conspirators were citizens.

139.    The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## CAUSE OF ACTION

140.    Plaintiffs hereby sue Defendants for participating, along with the Bank of America, in a conspiracy to fix, maintain or stabilize the price of, and to rig bids and allocate customers and markets for, Municipal Derivatives sold in the United States and its territories in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

141.    The combination and conspiracy alleged herein has had the following effects, among others:

      a. '    Price competition in the sale of Municipal Derivatives has been restrained, suppressed and/or eliminated in the United States;

      b.    Bids charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for Municipal Derivatives were fixed, stabilized and maintained at non-competitive levels throughout the United States;

c.    Customers and markets of Municipal Derivatives were allocated among Defendants and their co-conspirators;

d.    Plaintiffs and the other members of the Class received lesser interest rates on Municipal Derivatives than they would have received in a competitive marketplace, unfettered by Defendants and their co-conspirators' collusive and unlawful activities;

e.    Competition in the sale of Municipal Derivatives was restrained, suppressed and eliminated in the United States; and

f.    As a direct and proximate result of the illegal combination, contract or conspiracy, Plaintiffs and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined.

142.    As a result of this combination and conspiracy, Plaintiffs and members of the Class suffered injury to their business and property.

143.    Pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, Plaintiffs seek to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Class by reason of the violations alleged herein.

## FRAUDULENT CONCEALMENT

144.    Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

145.    Plaintiffs and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations. Neither Defendants nor their co-conspirators told Plaintiffs or other class members that they were rigging bids. To the contrary, Plaintiffs were falsely assured that the Broker Defendants were acting as their agents and were soliciting bids for Municipal Derivatives that were fair and competitively priced and that complied with specific IRS rules and regulations that required Broker Defendants to obtain at least three commercially reasonable bids. Accordingly, Plaintiffs and Class members could not have discovered the violations alleged herein earlier until shortly before the filing of this Complaint because Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

146.    Defendants and their co-conspirators engaged in a successful price-fixing conspiracy concerning Municipal Derivatives, which they affirmatively concealed, at least in the following respects:

    a.    By meeting secretly to discuss prices, customers and markets of Municipal Derivatives sold in the United States and elsewhere;

    b.    By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

c.    By intentionally creating the false appearance of competition by engaging in sham auctions in which the results were pre-determined;

d.    Through covert sharing of profits or other secret compensation paid to losing bidders;

e.    By secretly communicating about bids that would be won or lost by the Provider Defendants;

f.    By paying kickbacks to Broker Defendants;

g.    By submitting cover or courtesy bids, or unrealistically low or other artificial bids, and/or deliberately losing bids, to create the appearance of competition where there was none; and

h.    By covert agreements not to bid.

147.    As a result of Defendants and their co-conspirators' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiffs' and the Class's claims have been tolled.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    That judgment be entered for Plaintiffs and members of the Class against Defendants for treble damages sustained by Plaintiffs and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees;

D.    That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.    That Plaintiffs and members of the Class have such other, further or different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: March 12, 2008

By: _Michael D. Hausfell /cc_

Michael D. Hausfeld (DC Bar No. 153742)
Richard A. Koffman (DC Bar No. 461145)
Megan E. Jones (DC Bar No. 467255)
Christopher J. Cormier (DC Bar No. 496384)
COHEN, MILSTEIN, HAUSFELD & TOLL
P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

William A. Isaacson (DC Bar No. 414788)
Tanya Chutkan (DC Bar No. 420478)
Jonathan Shaw (DC Bar No. 446249)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131

Jonathan W. Cuneo (DC Bar No. 939389)
Daniel M. Cohen (DC Bar No. 470056)
CUNEO GILBERT & LADUCA, LLP
507 C Street NE
Washington, D.C. 20002
Telephone: (202) 789-3960
Facsimile: (202) 789-1813

Michael P. Lehmann
Christopher L. Lebsock
Jon T. King
COHEN, MILSTEIN, HAUSFELD & TOLL
P.L.L.C.
One Embarcadero Plaza
San Francisco, CA 94111
Telephone: (415) 229-2080
Facsimile: (415) 986-3643

Joel Davidow (DC Bar No. 50849)
Clifford K. Williams
KILE GOEKJIAN REED & McMANUS
PLLC
1200 New Hampshire Avenue, NW
Suite 570
Washington, DC 20036
Telephone: (202) 659-8000
Facsimile: (202) 659-8822

Robert G. Eisler
COHEN, MILSTEIN, HAUSFELD & TOLL
P.L.L.C.
150 East 52nd Street
Thirtieth Floor
New York, NY 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Allen Black
Roberta Liebenberg
Donald Perelman
FINE KAPLAN & BLACK, RPC
1835 Market Street
28th Floor
Philadelphia, PA 19103
Telephone: (215) 567-6565
Facsimile: (215) 568-5872

Carol V. Gilden
COHEN, MILSTEIN, HAUSFELD & TOLL,
P.L.L.C.
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Facsimile: (312) 357-0369

Samuel D. Heins
Vincent J. Esades
HEINS MILLS & OLSON
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
Facsimile: (612) 338-4692

Arthur N. Bailey
ARTHUR N. BAILEY & ASSOCIATES
111 West Second Street, Suite 4500
Jamestown, NY 14701
Telephone: (716) 664-2967
Facsimile: (716) 664-2983

Allan Steyer
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street, Third Floor
San Francisco, CA 94111
Telephone:    (415) 421-3400
Facsimile:    (415) 421-2234

Steven Greenfogel
MEREDITH COHEN GREENFOGEL &
SKIRNICK, P.C.
1521 Locust St., 8th Floor
Philadelphia, PA 19102
Telephone:  (215) 564-5182
Facsimile:  (215) 569-0958

Precious Martin Senior
PRECIOUS MARTIN SENIOR &
ASSOCIATES PLLC
821 North Congress St.
P.O. Box 373
Jackson, MI 39205-0373
Telephone: (601) 944-1447
Facsimile:  (601) 944-1448

Arnold Levin
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia , Pennsylvania 19106-3697
Telephone: (215) 592-1500
Facsimile:  (215) 592-4663

Armand Derfner
DERFNER ALTMAN & WILBORN
40 Calhoun Street, Suite 410
P.O. Box 600
Charleston, SC 29401
Telephone:  (843) 723-9804
Facsimile:  (843) 723-7446

Steven A. Kanner
FREED KANNER LONDON &
 MILLEN LLC
2201 Waukegan Rd.,
Suite 130
Bannockburn, IL 60015
Telephone:  (224) 224-632-4500
Facsimile:  (224) 632-4521

Brent Hazzard
HAZZARD LAW, LLC
6360 I 55 N
Suite 340
Jackson, MS  39211
Telephone:  (601) 977-5253
Facsimile:  (601) 977-5236

Joe R. Whatley Jr.
WHATLEY DRAKE & KALLAS LLC
2001 Park Place North
Suite 1000
Birmingham, Alabama  35203
Telephone:  (205) 328-9576
Facsimile:  (205) 328-9669

Stephen Neuwirth
QUINN EMANUEL URQUHART OLIVER
 & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100

Attorneys for One or More Individual Plaintiffs

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Fairfax County, Virginia | ~~See Attachment A.~~ Wachovia Bank, N.A. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY) _____
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Michael D. Hausfeld, Esq.
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Ave., NW, Suite 500 West
Washington, DC 20005   (202) 408-4600

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
⊙ 3 Federal Question (U.S. Government Not a Party)
○ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

⊙ **A. Antitrust**

[X] 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff))
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
15 U.S.C. Section 1, Sherman Act; price-fixing, bid-rigging, and customer/market allocation conspiracy

**VII. REQUESTED IN COMPLAINT** ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** [ ]    Check YES only if demanded in complaint    **JURY DEMAND:** YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☒ NO ☐ If yes, please complete related case form.

DATE 3/12/08    SIGNATURE OF ATTORNEY OF RECORD *Mith D Phode /cc*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

ATTACHMENT A to Civil Cover Sheet
Fairfax County, Virginia v. Wachovia Bank N.A., et al.
Defendants

AIG FINANCIAL PRODUCTS CORP.

BEAR, STEARNS & CO., INC.

FINANCIAL SECURITY ASSURANCE HOLDINGS, LTD.

FINANCIAL SECURITY ASSURANCE, INC.

FINANCIAL GUARANTY INSURANCE COMPANY

TRINITY FUNDING CO. LLC

GE FUNDING CAPITAL MARKET SERVICES, INC.

GENWORTH FINANCIAL INC.

NATIXIS S.A.

JP MORGAN CHASE & CO.

PIPER JAFFRAY & CO.

SOCIÉTÉ GÉNÉRALE SA

AIG SUNAMERICA LIFE ASSURANCE CO.

UBS AG

WACHOVIA BANK N.A.

SECURITY CAPITAL ASSURANCE INC.

XL ASSET FUNDING LLC

XL LIFE INSURANCE & ANNUITY COMPANY

NATIXIS FUNDING CORP.

INVESTMENT MANAGEMENT ADVISORY GROUP, INC.

CDR FINANCIAL PRODUCTS

FELD WINTERS FINANCIAL LLC

WINTERS & CO. ADVISORS, LLC

ATTACHMENT A to Civil Cover Sheet
Fairfax County, Virginia v. Wachovia Bank N.A., et al.
Defendants

FIRST SOUTHWEST COMPANY

GEORGE K. BAUM & CO.

KINSELL NEWCOMB & DE DIOS INC.

PACKERKISS SECURITIES, INC.

SHOCKLEY FINANCIAL CORP.

SOUND CAPITAL MANAGEMENT, INC.

CAIN BROTHERS & CO., LLC

MORGAN KEEGAN & CO., INC.

LEHMAN BROTHERS INC.

MGIC

MERRILL LYNCH & CO., INC.

MORGAN STANLEY

2